IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

MICHAEL MULGREW

    Plaintiff,

v.   Case No.

PRINCE WILLIAM COUNTY SCHOOL BOARD

    Defendant.

## COMPLAINT

COMES NOW your Plaintiff, MICHAEL MULGREW, by counsel and moves this Court to enter judgment in his favor against Defendant Prince William County School Board ("PWCS") as follows:

### NATURE OF ACTION

1. This is a civil action alleging an Equal Employment Opportunity violation and, in the alternative, a breach of contract.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

2. Plaintiff has satisfied the procedural and administrative requirements for proceeding under Title VII, as follows:

    -On August 10, 2022, Plaintiff submitted a charge with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964 including violations for race discrimination.

    - On August 19, 2022, Plaintiff received a Notice of Right to Sue letter from the EEOC.

1

## PARTIES

3. Plaintiff Michael Mulgrew ("Plaintiff") is a resident of the Commonwealth of Virginia over the age of 18.

4. Defendant Prince William County School Board, associated with the Prince William County Schools Division, is located in Prince William County, Virginia.

## JURISDICTION AND VENUE

5. This action is brought pursuant to Title VII of the Civil Rights Act of 1964 for employment discrimination. Jurisdiction is specifically conferred on the Court by 28 U.S.C. §1331, 28 U.S.C. §1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal law and Plaintiff's civil rights.

6. This Court may properly maintain personal jurisdiction over Defendant because it conducts business in the Commonwealth of Virginia.

7. Venue is properly laid in the judicial district ("District)" because all of the events or omissions giving rise to Plaintiff's claims occurred within the District.

8. Venue is properly laid in the District pursuant to 42 U.S.C. §2000e-5(f)(3) because Plaintiff worked in the District.

## FACTS

9. In 2005, Plaintiff Michael Mulgrew ("Mulgrew") applied for the position of Associate Superintendent for High Schools of Prince William County Schools. Ms. Lillie Jessie ("Jessie"), at that time an elementary principal, also applied for the position.

10. Mr. Mulgrew was offered and accepted the position of Associate Superintendent and held that position through February of 2022.

11. Once Mr. Mulgrew was hired, he became aware of a letter authored by Ms. Jessie which criticized his hiring over her. This letter mentioned Mr. Mulgrew's ethnicity, specifically the fact that his mother was born in Puerto Rico, and this letter was read aloud at a meeting. Subsequent to that time, Ms. Jessie was denied two other Associate positions for which she applied. Although she authored separate letters criticizing those decisions, she never mentioned the ethnicity of the other candidates chosen over her.

12. In 2012, Ms. Jessie was elected as a School Board Member for the Occoquan District of Prince William County. As such, she remained an employee of the PWCS. She holds that position to this date.

13. In 2013 Mr. Mulgrew offered to drive Ms. Jessie into Washington, D.C. to attend a recognition event for Dave Huckstein, the previous principal of Woodbridge High School, who was selected as Principal of the Year. During the ride, Ms. Jessie referred to powerful men at her church who had "weaknesses," an obvious reference to having sex with women outside of their marriage. She then told Mr. Mulgrew that she had him "checked out" and that he "was clean." Mr. Mulgrew took this action and Ms. Jessie's admission of that action as an act of intimidation. If she would go after people Mr. Mulgrew believed were her political allies, she would certainly go after Mr. Mulgrew.

14. Mr. Mulgrew called the Board Chair, Dr. Babur Lateef, about his recommendation for selection of two new High School Principals, at Gar-Field High School and Potomac High School. Dr. Lateef refused to accept the recommendation to select these qualified candidates for promotion simply because it was Mr. Mulgrew's recommendation. Later, Mr. Mulgrew learned from a Board member that Dr. Lateef claimed his opposition was because the two principals were "Mickey's boys."

15. In or around December 2015, School Board members, including Ms. Jessie, met at a party to discuss the personnel changes that would take place once the new Board assumed their roles. As a result, several employees, including Mr. Mulgrew, had their contracts reviewed over the Winter Holiday and were discussed by Board Members for possible reassignment or termination. Ms. Jessie was active in this action in conspiring to terminate or reassign employees, including Mr. Mulgrew, which was in violation of Mr. Mulgrew's contract with PWCS and counter to any Board member's authority or obligation.

16. During the Spring of 2019, Mr. Mulgrew was informed by a Board member that the Board Chair Babur Lateef had called that Board member seeking his support in an action contemplated by two other Board Members, including Ms. Jessie, to force Mr. Mulgrew from his position.

17. In or around July 2019, Jason T. Eldredge was appointed the Activities Director ("AD") for Woodbridge High School. He was selected for the position by Principal Heather L. Abney ("Abney"). Prior to this announcement, Ms. Jessie sent information to Mr. Mulgrew from a Fairfax Blog site, the Fairfax Underground, where citizens were critical of Mr. Ethridge's coaching. It is unknown how Ms. Jessie or the person who sent this information, knew of Mr. Ethridge's candidacy.

18. When Mr. Mulgrew called Ms. Jessie to inform her of the Activities Director selection at Woodbridge, Ms. Jessie immediately blamed Mr. Mulgrew for not selecting the "African American candidate" and refused to accept that Ms. Abney made the recommendation. Ms. Jessie also stated that Mr. Mulgrew "scared Mr. [Gary]Wortham to death," even though there had never been a negative conversation between the two employees.

19. During the first few months of Mr. Eldredge's tenure as AD, friction developed between Mr. Eldredge and the Woodbridge football coaching staff, most specifically Gary Wortham.

20. Subsequent to Mr. Eldredge admonishing the coaching staff for violating various school policies, Mr. Wortham submitted his resignation on August 15, 2019.

21. Although Mr. Wortham and the Woodbridge High School administration engaged in discussions subsequent to his tendering his resignation which resulted in Mr. Wortham withdrawing said resignation, that truce was short lived.

22. Mr. Wortham resigned permanently on October 25, 2019 effective at the conclusion of the 2019 football season. Members of the football coaching staff, including Mr. Wortham, claimed that Mr. Eldredge had been hired by Woodbridge HS with specific instructions to get rid of the football coaching staff and claimed that the instructions had come directly from Mr. Mulgrew. Mr. Mulgrew did not issue any instructions or directives to Mr. Eldredge of any kind, let alone concerning the football coaching staff at Woodbridge.

23. On November 19, 2019, the Closed Session of the School Board agenda included Woodbridge High School administration's response to parental concerns about the Woodbridge football coaching resignations. During this meeting, Ms. Abney cited numerous concerns within the football program at Woodbridge. High School.

24. At the conclusion of these remarks and in violation of the rules for Closed Session, Ms. Jessie accused Mr. Mulgrew of being responsible for the issues and the parental concerns related to the program. She stated that the complaints she received were related to Mr. Mulgrew's conduct and continued to claim that Mr. Mulgrew was responsible for the situation, arguing that he was "running the building" and responsible for the negative perception of Woodbridge.

25. Although another Board member attempted to stop Ms. Jessie from speaking out of turn and off topic, the Board Chair interjected and allowed Ms. Jessie to continue. The Board attorney

who knew this conversation was not on the agenda, permitted the Board Chair and Ms. Jessie to continue her tirade.

26. Ms. Jessie repeatedly stated that it was Mr. Mulgrew and not Ms. Abney who had concerns about the program. Ms. Jessie claimed that Mr. Mulgrew ordered the crackdown of the Woodbridge program and was responsible for Mr. Wortham's resignation.

27. Although Ms. Abney stated that Mr. Eldredge was the "unanimous selection of the panel and principal", Ms. Jessie continued to insist that Mr. Mulgrew had unilaterally hired Mr. Eldredge and was responsible for Mr. Eldredge's efforts to get rid of the Woodbridge High School coaching staff.

28. Witnesses at the event described Ms. Jessie's action as being hostile, bullying and unprofessional, resulting in Mr. Mulgrew's public humiliation in front of his peers, subordinates, supervisors and the School Board. The course that the Board had set for Mr. Mulgrew's ouster was firmly established. Mr. Mulgrew did not respond to Ms. Jessie's allegations because this was a Board meeting and he was not given the opportunity to respond.

29. The statements by Ms. Jessie were meant to solicit Board support for Mr. Mulgrew's removal from his position with PWCS, which was Ms. Jessie's goal. Specifically, Ms. Jessie alleged that Mr. Mulgrew was attempting to "destroy the Worthams" and that was the reason for the controversy that necessitated the Closed Session. The next day, Ms. Jessie texted Ms. Amy White, Associate Superintendent, and stated she "warned him [Mulgrew]."

30. Ms. Jessie was convinced that Mr. Mulgrew was responsible for the hiring of Mr. Eldredge and not Principal Abney. She accused Mr. Mulgrew of not paying attention during the DSA interviews and "was on the phone the whole time" because he had already decided that Mr. Eldredge was a "done deal."

31. Ms. Jessie concluded by stating that the African American candidate (who was the former DSA's son) "never stood a chance".

32. In response to Ms. Jessie's behavior and the fact that the head of the School Board permitted Ms. Jessie to continue her statements about Mr. Mulgrew in direct contravention to the policies and procedures that govern Closed Sessions of the school board, Mr. Mulgrew filed a complaint against Ms. Jessie with PWCS. An investigation into the parent and Ms. Jessie's concerns was initiated and conducted after which Mr. Mulgrew was told by someone who had access to the report, that it "exonerated" him.

33. An investigation was conducted in response to Mr. Mulgrew's complaint and various witnesses confirmed Mr. Mulgrew's representation of Ms. Jessie's actions and comments during the meeting.

34. Individuals who witnessed the tirade confirmed to the investigator that Ms. Jessie acted in an inappropriate, unprofessional and bullying manner. They stressed the power differential between Ms. Jessie and Mr. Mulgrew with Ms. Jessie, as a School Board member able to freely lodge her accusations while Mr. Mulgrew was restrained by his position to either respond or rebut her remarks.

35. Ms. Jessie confirmed to the investigator that it was her belief that it was Mr. Mulgrew and not Principal Abney who made the decision to hire Mr. Eldredge as the DSA.

36. Although the investigation concluded that Ms. Jessie's behavior did not rise to the level of bullying under the Code of Virginia, her behavior was determined to be unprofessional and in violation of various sections of the School Board's Code of Conduct and Code of Ethics. It is unclear if Ms. Jessie suffered any negative actions as a result of her inappropriate behavior. No apology was given to Mr. Mulgrew and the Board reimbursed Ms. Jessie for her legal fees.

37. In addition, twice Mr. Mulgrew received accusatory phone calls from individuals from PWCS Human Resources (HR). During the first call, Mr. Mulgrew was accused of not informing one of his colleagues that an employee wished to return to high school. The statement from Human Resources was, "We are a team and you should have informed her of this situation." Without discussion, the Human Resources supervisor accused Mr. Mulgrew of unprofessionalism. After the phone call, Mr. Mulgrew provided HR an email from Cynthia Treichler, the employee, where she stated she had informed her supervisor. Another time, Mr. Mulgrew received a call from Human Resources alleging that "Word on the street is that you directed your principals to falsify payroll sheets." When Mr. Mulgrew asked who made this accusation, he was told, "I am not going to tell you that!" Mr. Mulgrew's secretary went back on the Zoom conference and found in writing the direction the principals had agreed upon and sent a text to HR with the information in writing.

38. Although Ms. Jessie claimed it was Mr. Mulgrew's conduct that was in question, Mr. Mulgrew was denied access to the investigation report by the Prince William County School system. When finally interviewed regarding his complaint, the investigator asked Mr. Mulgrew, "why are they so consumed with you?"

39. On February 26, 2020, in conversations with the then Superintendent, Mr. Mulgrew learned that the Board Chair, during the fall of 2019, petitioned the Superintendent claiming that Mr. Mulgrew needed to be fired based on unfounded parental concerns at Board meetings about Woodbridge. The Superintendent sought the assistance of the School Board attorney, Ms. McGowan, to advise Dr. Lateef that he was not allowed to have such conversations demanding a staff member be fired. The Board Chair was advocating for Mr. Mulgrew's termination without due process which would be in violation of the terms of his employment.

40. In March of 2021, PWCS Risk Management initiated an investigation at the request of Human Resources, after an Assistant Principal received a series of parental complaints regarding a teacher's failure to grade and post student assignments.

41. On June 14, 2021, Sean Robinson, Esq., on behalf of Gary Wortham, directed a letter to Mary McGowen, Division Counsel of PWCS accusing Mr. Mulgrew of various criminal activities. Cozy Bailey, the Prince William County NAACP President was copied on the letter. Mr. Baily has no relationship to the PWCS system but is associated with Lillie Jessie. There is a process for complaints firmly established in Prince William County and the employee, Mr. Wortham, did not follow those procedures.

42. Specifically, the June 14, 2021 letter accused Mr. Mulgrew of "tortiously interfering" with Mr. Wortham's attempts to secure a football coaching position at C.D. Hylton High School.

43. The letter alleged that "on May 17th, Mr. Wortham was offered a coaching position with C.D. Hylton High School coaching staff. As Mr. Wortham was prepared to accept that position, he was informed by C.D. Hylton High School administration that 'Mr. Wortham could not coach at C.D. Hylton High School.'"

44. Mr. Robinson further alleged that "Mr. Mulgrew's actions were illegal since Mr. Mulgrew [sic] actions prevented Mr. Wortham from obtaining the coaching position at C.D. Hylton High School."

45. The letter concluded by stating that this "letter serves as a pre-litigation courtesy to resolve these matters outside of a court of law. Please advice [sic] Mr. Mulgrew that if this illegal interfering continues, that further legal actions will be taken to stop and correct Mr. Mulgrew intentional [sic] tortious interference."

46. After a preliminary investigation, Mary McGowen responded to Mr. Robinson's June 14, 2021 letter advising that her initial inquiry had found no evidence that Mr. Wortham had applied for the referenced coaching position at C.D. Hylton High School, which was still posted as an open, unfilled position.

47. Ms. McGowan advised that no interviews had yet been scheduled and no recommendations for hiring had been submitted to the Department of Human Resources. Further, no one from Hylton had the authority, either at the time of her response or on May 17, 2021, to offer that position to any applicant. Mr. Mulgrew was never aware of Mr. Wortham's applying for the position and did not get involved in hiring decisions for assistant coaching positions at high schools. He only approved or disapproved candidates once the name was entered into the HR system. Mr. Wortham's name was never entered into the system.

48. Mr. Robinson was requested to provide responses to specific questions related to Mr. Wortham's alleged offer, application and interview to allow Ms. McGowan to further investigate.

49. Ms. McGowan heard nothing further from Mr. Robinson or Mr. Wortham related to the claims put forth in the June 14, 2021 correspondence.

50. Mr. Mulgrew was made aware of this letter by Ms. McGowan, who showed him the email attached and informed him the information was sent to Cozy Bailey. She also stated that this letter was defamatory. Mr. Mulgrew worked with counsel, Mr. Bamberger, about these concerns of continued defamatory statements and the threats to his employment.

51. On August 11, 2021, counsel for Mr. Mulgrew contacted Ms. McGowan and advised that should the issues raised in that letter proceed any further, he would require access to materials not currently available to Mr. Mulgrew to defend himself. The specific documents included, but

were not limited to, various investigative reports prepared related to Mr. Mulgrew's complaints related to Ms. Jessie. Ms. McGowan, on August 12, then called Mr. Bamberger and advised that the District would make sure the Woodbridge report remained confidential. The letter from the Associate from Human Resources was written to Dr. McDade on August 12 corresponding with Ms. McGowan's call in the morning.

52. Mr. Mulgrew was notified on August 13, 2021 by Latanya D. McDade, Superintendent of Schools and Human Resources that he was being placed on administrative leave related to the investigation of the teacher and her grades.

53. They assured Mr. Mulgrew that this administrative leave was done for his "protection" and the Superintendent said, "I have had to do this kind of thing before". . Contrary to the Regulation regarding complaints at the time, Mr. Mulgrew was not afforded the opportunity to speak or answer any concerns.

54. Contrary to the assurances of McDade, Mr. Mulgrew was informed by the investigator during an interview about the teacher, that he, Mr. Mulgrew, was in fact, the subject of the investigation. Because he was intentionally misled as to the true nature of the investigation , Mr. Mulgrew was not accompanied by legal counsel for the interview as any subject of an investigation would have the right to do. He was blindsided by the actions of the administration and the investigator.

55. As a result of the actions of McDade, Mr. Mulgrew again consulted with his counsel. On September 2, 2021, Stephen A Bamberger, Esq. contacted Mary McGowan on behalf of Mr. Mulgrew and advised that he would require access to all documentation that resulted in the Superintendent's decision to suspend Mr. Mulgrew.

## SIMILARLY SITUATED INDIVIDUALS

56. On July 02, 2021, Risk Management and Security Services of PWCS received an anonymous complaint related to the inability to schedule the athletic field at Freedom High School. Apparently, the issue centered around Freedom High School football coach, Darryl D. Overton's use of the field for his private business to the exclusion of any other users.

57. An investigation was conducted that determined that Mr. Overton, despite multiple directives over a number of years that he was not to utilize the fields for his personal business, continued with this practice. In addition, Mr. Overton avoided paying the appropriate fees for the use of the fields in direct contravention of the rules promulgated by the PWCS.

58. The investigation discovered at least two 2019 events that were represented as fundraisers for Freedom Football but were in fact fundraisers for Mr. Overton's' private business, PME. Mr. Overton misrepresented the purpose of the fundraiser to the administration at the time the fields were scheduled and avoided paying significant field charges for those times. The Report showed numerous entries for Freedom Football in the field reservation records that were approved by Risk Management but were actually events for Mr. Overton's private business. The entries were made by an administrator.

59. Despite the findings of the August 2021 investigative report, which was known to the Freedom administration, Mr. Overton continued to utilize the Freedom High School fields throughout August, September and October without payment of appropriate fees. Instead of taking necessary administrative action after the summer report, the School Division permitted Mr. Overton to continue to use the fields and allowed him to "retroactively" pay back a portion of the funds for field usage to the Division. The person replacing Mr. Mulgrew in this responsibility identifies as an ethnicity different from Mr. Mulgrew.

60. Despite the findings of the investigative report that called for a police investigation into the failure to pay for use of the fields, actions that could rise to the level of a felony, the Division did not take action against any of the individuals involved. None of the persons responsible were placed on administrative leave and were permitted to remain in their jobs with the school system or remained working with PWCS after retirement through an agreement with the PWCS. These actions over the time frame could constitute a felony in Virginia but in fact there was no discipline or negative repercussions imposed on any of the individuals involved.

61. All of the individual involved with the Freedom football situation are African American or White and were not held to the standards of school policy or the law.

62. The Division covered up the actions of these employees, allowing all to remain employed with PWCS or continue to work after retiring from the system. In February 2022, Mr. Mulgrew was informed by Ms. McGowan that a new investigation into his supervision of Freedom was to occur. It was clear that the intent was to deflect the blame for the behavior of the African American employees onto Mr. Mulgrew.

63. Mr. Mulgrew was offered a settlement agreement that would have stripped him of his contractual right to participate int the PWCS Retirement Opportunity Program (ROP) and would have prevented him from bringing any legal action against PWCS. He was informed that if he did not take the settlement agreement as-is he would be terminated for cause.

64. Knowing these facts and learning of another investigation into his supervision of Freedom, Mr. Mulgrew retired in February 2022.

## COUNT I
## RETALIATION IN VIOLATION OF EEOC

65. Plaintiff incorporates the allegations of Paragraph 1 – 64 as if fully restated herein.

66. Plaintiff Mickey Mulgrew is of Puerto Rican descent.

67. Mr. Mulgrew was subjected to years of unwarranted attacks on his professionalism and employment because of animosity toward his race.

68. As a result of retaliation for filing a complaint in 2019, Mr. Mulgrew was subjected to multiple investigations and ultimately a long term suspension that led to what was essentially a forced retirement from the PWCS system.

69. Plaintiff is a member of a protected class who suffered adverse employment action despite no legitimate issues with his performance.

70. The Defendant's conduct as alleged above constituted discrimination based on race and ethnicity in violation of Title VII. Defendant was subjected to retaliation for protected activity, unwarranted investigation and suspension, was misled about the target of the investigation and left with no option but to resign in order to protect his retirement benefits.

71. Similarly situated PWCS employees of different race and ethnicity, subject to the same policies and regulations as Mr. Mulgrew, violated Division policies and procedures and committed felonious activities, contrary to management direction to cease the behavior.

72. Instead of being forced from their jobs, these individuals were granted the ability to retroactively correct their intentional violations of policy and law, continue to maintain employment with PWCS and after retirement, were permitted to continue to work within the System for financial gain.

73. The above-described race discrimination interfered with Plaintiff's employment and well-being.

74. As a result of the hostile, offensive and discriminatory behavior by the Defendant, its agents and employees, and the failure of the Defendant to protect Plaintiff from such discrimination, Plaintiff suffered humiliation, emotional stress and loss of employment.

75. As a result of the discriminatory behavior of Defendant, Plaintiff has suffered loss of income and loss of earning potential.

76. Mr. Mulgrew has experienced emotional pain and suffering as a result of the discriminatory behavior of the Defendant which was engaged in knowingly and intentionally with the intended result of forcing him from his position with PWCS.

77. The Defendant, through its agents and/or employees failed to adequately supervise the conduct that led to the race and ethnicity discrimination suffered by Plaintiff. The Defendant failed to take all necessary and reasonable steps to eliminate discrimination based on race and ethnicity from the workplace and to prevent it from occurring in the future.

78. As further direct and proximate cause of Defendant's violation of Title VII as described above, Plaintiff has been compelled to retain the services of counsel in an effort to protect his rights with respect to the Defendant's action and has thereby incurred and will continue to incur legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff.

## COUNT II
## BREACH OF EMPLOYMENT CONTRACT

79. Plaintiff incorporates the allegations of Paragraph 1 – 78 as if fully restated herein.

80. Plaintiff and Defendant entered into a contract at the start of Mr. Mulgrew's employment with PWCS and that contract was renewed each year going forward with the term of the last contract July 1, 2021 through June 30, 2022.

81. Mr. Mulgrew's employment contract provided for termination only under certain specific circumstances.

82. In an effort to push Mr. Mulgrew out of employment with PWCS, employees and agents of Defendant subjected Mr. Mulgrew to years of inappropriate, harassing and discriminatory behavior resulting in multiple investigations purportedly into his behavior.

83. On August 21, 2021, Mr. Mulgrew was advised that he was being placed on Administrative Leave with pay, for his own protection, pending an external investigation into his role related to a teacher accused of misconduct.

84. Contrary to his contract and PWCS policies and regulations, Mr. Mulgrew was not afforded the opportunity to defend himself in these investigations and was in fact, specifically advised by Dr. Latanya McDade that he was not the subject of the investigation, causing him to present for interview without legal representation.

85. The statements of Dr. McDade were untrue on their face as evidenced by the content of the August 12, 2021 Superintendent's Working Paper related to Mr. Mulgrew's alleged involvement in the internal investigation of the faculty member.

86. Mr. Mulgrew was not afforded the opportunity to review the investigative report related to his 2019 complaint against Ms. Lillie Jessie, nor was he permitted the opportunity to review any portions of the investigative report related to the misconduct of the High School teacher that was, allegedly, the basis for his administrative leave and the efforts to push Mr. Mulgrew out of his job.

87. Defendant used the 2021 investigation into "employee misconduct" related to a High School teacher as a pretense for pushing Mr. Mulgrew out of his employment with PWCS.

88. Mr. Mulgrew did not violate the terms of his contract nor did he engage in any behavior that would have warranted his dismissal from PWCS per the terms of his contract and the Rules, Regulations and Policies of PWCS.

89. As a result of the breach of contract on the part of Defendant, Mr. Mulgrew has suffered financial loss in the form of lost wages, lost earning potential and lost income based on his prohibition from participating in the Retirement Opportunity Program ("ROP").

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against the Defendant and prays that this Court grant the following relief.

1) With regard to either Count I or Count II: Damages in an amount to be proven at trial but in excess of Six Hundred Fifty Thousand Dollars ($650,000.00);

2) With regard to Count I:

    a) Pain and suffering;

    b) Award the costs of this action and reasonable attorneys' fees and expenses;

    c) Punitive damages to punish the Defendant for its willful, wanton, oppressive, malicious and/or grossly negligent conduct;

3) With regard to either Count I or Count II: Award pre-judgment and post-judgment interest; and

4) Grant such other and further relief as the Court should deem just.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues for which a trial by jury may be had.

**DATED:** November 17, 2022

Respectfully submitted,
Michael Mulgrew
By Counsel

*/s/ Milton C. Johns*

Milton C. Johns, VSB No. 42305
Jill F. Helwig, VSB No. 83202
Executive Law Partners, PLLC
11130 Fairfax Blvd, Suite 303
Fairfax, VA 22020
T: (571) 500-1010
F: (571) 408-8102
mjohns@xlppllc.com
jhelwig@xlppllc.com
*Counsel for Plaintiff*