**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

_____ )
MICHAEL MULGREW                           )
                                          )
      Plaintiff,                         )
                                          )
      v.                                 )    Case No. 1:22-cv-01311
                                          )
PRINCE WILLIAM COUNTY SCHOOL              )
    BOARD                                 )
                                          )
                                          )
      Defendant.                         )
_____ )

## AMENDED COMPLAINT

COMES NOW your Plaintiff, MICHAEL MULGREW, by counsel and moves this Court to enter judgment in his favor against Defendant Prince William County School Board ("PWCS") as follows:

## NATURE OF ACTION

1. This is a civil action alleging an Equal Employment Opportunity violation and, in the alternative, a breach of contract.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

2. Plaintiff has satisfied the procedural and administrative requirements for proceeding under Title VII, as follows:

-On August 10, 2022, Plaintiff submitted a charge with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964 including violations for race discrimination.

- On August 19, 2022, Plaintiff received a Notice of Right to Sue letter from the EEOC.

## PARTIES

3.  Plaintiff Michael Mulgrew ("Plaintiff") is a resident of the Commonwealth of Virginia over the age of 18.

4.  Defendant Prince William County School Board, associated with the Prince William County Schools Division, is located in Prince William County, Virginia.

## JURISDICTION AND VENUE

5. This action is brought pursuant to Title VII of the Civil Rights Act of 1964 for employment discrimination. Jurisdiction is specifically conferred on the Court by 28 U.S.C. §1331, 28 U.S.C. §1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal law and Plaintiff's civil rights.

6.  This Court may properly maintain personal jurisdiction over Defendant because it conducts business in the Commonwealth of Virginia.

7.  Venue is properly laid in the judicial district ("District)" because all of the events or omissions giving rise to Plaintiff's claims occurred within the District.

8.  Venue is properly laid in the District pursuant to 42 U.S.C. §2000e-5(f)(3) because Plaintiff worked in the District.

## FACTS

9.  In 2005, Plaintiff Michael Mulgrew ("Mulgrew") applied for the position of Associate Superintendent for High Schools of Prince William County Schools. Ms. Lillie Jessie ("Jessie"),

at that time an elementary principal, also applied for the position. Mr. Mulgrew is Hispanic (Puerto Rican). Ms. Jessie is Black.

10. Mr. Mulgrew was offered and accepted the position of Associate Superintendent and held that position through February of 2022.

11. After Mr. Mulgrew was hired, he became aware of a letter authored by Ms. Jessie which criticized his hiring over her. This letter raised Mr. Mulgrew's ethnicity, specifically the fact that his mother was born in Puerto Rico, and this letter was read aloud at a deputy superintendent meeting in front of Mr. Mulgrew's peers. Ms. Jessie was later denied two other Associate positions for which she applied. Although she authored separate letters criticizing those decisions, she did not mention the ethnicity of the other candidates chosen over her.

12. In 2010, School Board attorney Mary McGowan conducted an investigation related to a parent complaint related to the baseball program at Battlefield. Without interviewing Mr. Mulgrew, Ms. McGowan prepared and presented a negative report to the School Board in Closed Session concluding that Mr. Mulgrew had failed to follow the proper procedures in dealing with the concern. The report claimed that if not for the swift action taken by the Deputy Superintendent upon learning of this concern on June 9, 2010, the Division would have faced significant issues. Had Mr. Mulgrew been interviewed during this investigation, he would have shared an email that demonstrated that he had, in fact, timely and properly advised the Deputy Superintendent of this issue on May 24, 2010.

13. In 2012, Ms. Jessie was elected as a School Board Member for the Occoquan District of Prince William County. As such, she remained an employee of the PWCS. She holds that position to this date.

14.  In 2013 Dave Huckstein, the previous principal at Woodbridge, was selected as Principal of the Year. In an effort to be civil, Mr. Mulgrew agreed to drive Ms. Jessie, now a Board member, to the recognition event in Washington, D.C. During the ride home, Ms. Jessie was discussing things at her church and stated that certain high profile men had "weaknesses" in terms of sex outside of their marriages. The clear reference was to a local politician from her church. Without explanation, Ms. Jessie turned to Mr. Mulgrew and stated, "I had you checked out. You're clean."  The statement was clearly meant to intimidate Mr. Mulgrew by letting him know that Ms. Jessie was looking for "dirt" on him and had been discussing Mr. Mulgrew's personal conduct with others. Ms. Jessie made it very clear that she would be looking for anything she could find to diminish Mr. Mulgrew professionally.

15. Mr. Mulgrew called the Board Chair, Dr. Babur Lateef, about his recommendation for selection of two new High School Principals at Gar-Field High School and Potomac High School. Dr. Lateef refused to accept the recommendation to select these qualified candidates for promotion simply because it was Mr. Mulgrew's recommendation. Later, Mr. Mulgrew learned from a Board member that Dr. Lateef claimed his opposition was because the two principals were "Mickey's boys."

16. In or around December 2015, School Board members, including Ms. Jessie, met at a party to discuss the personnel changes that would take place once the new Board assumed their roles. As a result, several employees, including Mr. Mulgrew, had their contracts reviewed over the Winter Holiday and were discussed by Board Members for possible reassignment or termination. Ms. Jessie was active in this action in conspiring to terminate or reassign employees, including Mr. Mulgrew, which was in violation of Mr. Mulgrew's contract with PWCS and counter to any Board member's authority or obligation with regard to associate superintendents.

17. During the Spring of 2019, Mr. Mulgrew was informed by a Board member that Board Chair Lateef had called that Board member seeking his support in an action contemplated by two other Board Members, Ms. Jessie and Ms. Williams, both of whom are Black, to remove Mr. Mulgrew from his position.

18. In or around July 2019, Jason T. Eldredge was appointed the Activities Director ("AD") for Woodbridge High School. He was selected for the position by Principal Heather L. Abney, ("Abney"). Ms. Abney is Black. Prior to the announcement of his selection, Ms. Jessie sent a posting to Mr. Mulgrew from a Fairfax Blog site, the Fairfax Underground, wherein there were comments critical of Mr. Eldredge's coaching. It is unknown how Ms. Jessie or the person who authored these comments knew of Mr. Eldredge's candidacy as there is Board Members do not have access to candidates for an administrative position at the high school level.

19. The point of this communication from Ms. Jessie was to intimidate Mr. Mulgrew and push to dissuade him from "recommending" Mr. Eldredge for the open position.[1]

20. When Mr. Mulgrew called Ms. Jessie to inform her of the Activities Director selection at Woodbridge, Ms. Jessie immediately blamed Mr. Mulgrew for not selecting the "African American candidate" and refused to accept that Ms. Abney made the recommendation. Ms. Abney is Black. Ms. Jessie also stated that Mr. Mulgrew "scared Mr. [Gary]Wortham to death," even though there had never been a negative conversation between the two employees. Mr. Mulgrew does not know why Ms. Jessie made this statement concerning Mr. Wortham but was aware that Mr. Wortham, as the football coach at Woodbridge, would be supervised by the new AD, in this case, Mr. Eldredge.

---

[1] The interviewing of potential ASD candidates is conducted by a school based panel (i.e. principal, coaches, parents). The Principal will make the selection and this individual is then "recommended" to Mr. Mulgrew as the Assistant Superintendent. As Assistant Superintendent, Mr. Mulgrew would accept the selection of the Principal and then make the recommendation of that individual to the Superintendent and eventually, the School Board.

21. During the first few months of Mr. Eldredge's tenure as AD, friction developed between Mr. Eldredge and the Woodbridge football coaching staff, most specifically Gary Wortham.

22. Subsequent to Mr. Eldredge admonishing the coaching staff for violating various school policies, Mr. Wortham submitted his resignation on August 15, 2019.

23. Mr. Wortham and the Woodbridge High School administration engaged in discussions subsequent to his tendering his resignation which resulted in Mr. Wortham withdrawing said resignation. However, that truce was short lived. Ms. Jessie went to Woodbridge High on the day Mr. Wortham resigned to speak with the principal. Mr. Mulgrew was on leave that day and Mr. Mallard, a retired Deputy, informed the school Ms. Jessie had no standing to interfere in this situation.

24. Mr. Wortham resigned permanently on October 25, 2019 effective at the conclusion of the 2019 football season. Members of the football coaching staff, including Mr. Wortham, claimed that Mr. Eldredge had been hired by Woodbridge HS with specific instructions to get rid of the football coaching staff and claimed that the instructions had come directly from Mr. Mulgrew. Mr. Mulgrew did not issue any instructions or directives to Mr. Eldredge of any kind, let alone concerning the football coaching staff at Woodbridge.

25. Mr. Mulgrew believes that the unfounded claims related to his involvement with the Woodbridge coaching staff originated with Ms. Jessie.

26. On November 19, 2019, the Closed Session of the School Board agenda included Woodbridge High School administration's response to concerns raised by Woodbridge HS parents  related to the  Woodbridge football coaching resignations. Discussions during Closed Sessions of the School Board are specifically limited to those items on the agenda. Deviation

from that agenda is a violation of PWCS policy. During this meeting, Ms. Abney cited numerous issues within the football program at Woodbridge. High School.

27. At the conclusion of these remarks and in violation of the rules for Closed Session, Ms. Jessie directly addressed Mr. Mulgrew, accusing him of being responsible for the issues and the parental concerns related to the athletic program. She stated that the complaints she received were related to Mr. Mulgrew's conduct and continued to claim that Mr. Mulgrew was responsible for the situation, arguing that he was "running the building" and responsible for the negative perception of Woodbridge.

28. Although another Board member attempted to stop Ms. Jessie from speaking out of turn and off topic, the Board Chair interjected and allowed Ms. Jessie to continue, in direct violation of the policies and procedure that govern the behavior of the School Board. The Board attorney present during Closed Session knew this topic was not on the agenda but permitted Ms. Jessie to continue her tirade against Mr. Mulgrew, nonetheless.

29. Ms. Jessie repeatedly stated that it was Mr. Mulgrew and not Ms. Abney who had concerns about the program. Ms. Jessie claimed that Mr. Mulgrew ordered the crackdown of the Woodbridge program and was responsible for Mr. Wortham's resignation.

30. Although Ms. Abney confirmed that Mr. Eldredge was the "unanimous selection of the panel and principal," Ms. Jessie continued to insist that Mr. Mulgrew had unilaterally hired Mr. Eldredge and was responsible for Mr. Eldredge's efforts to get rid of the Woodbridge High School coaching staff.

31. The statements by Ms. Jessie were meant to solicit Board support for Mr. Mulgrew's removal from his position with PWCS, which was Ms. Jessie's goal. Specifically, Ms. Jessie alleged that Mr. Mulgrew was attempting to "destroy the Worthams" and that was the reason for the

controversy that necessitated the Closed Session. The next day, Ms. Jessie texted Ms. Amy White, Associate Superintendent, and stated she "warned him [Mulgrew]." Ms. White showed Mr. Mulgrew the text.

32. Ms. Jessie was convinced that Mr. Mulgrew was responsible for the hiring of Mr. Eldredge and not Principal Abney. She accused Mr. Mulgrew of not paying attention during the DSA interviews and alleged that he "was on the phone the whole time" because he had already decided that Mr. Eldredge was a "done deal."

33. Ms. Jessie concluded by stating that the African American candidate (who was the former Director of Student Activities' ["DSA"] son) "never stood a chance."

34. By this point, the course that the Board had set for Mr. Mulgrew's ouster was firmly established

35. In response to Ms. Jessie's behavior and the fact that the head of the School Board permitted Ms. Jessie to continue her statements about Mr. Mulgrew in direct contravention to the policies and procedures that govern Closed Sessions of the school board, Mr. Mulgrew filed a complaint against Ms. Jessie with PWCS.

36. The complaint filed by Mr. Mulgrew in November of 2019 specifically called out the behavior of Ms. Jessie as a violation of the anti-bullying statute and also cited and provided examples of Ms. Jessie's racial animus toward Mr. Mulgrew that clearly directed her interactions with Mr. Mulgrew from as  early as 2005. A copy of the November 2019 complaint is attached as **Att. A.**

37. The November complaint details actions of Ms. Jessie over a 15 year period that revolved around her attempts to protect individuals that were of a different race than Mr. Mulgrew and

clearly implied that Mr. Mulgrew was biased against individuals because of his Puerto Rican heritage.

38. The filing of this complaint resulted in a formal investigation conducted by an outside law firm. For reasons not made clear by PWCS and despite Ms. Jessie's assertion that the investigation was the result of Mr. Mulgrew's actions, Mr. Mulgrew has not been permitted access to the final Woodbridge Report. He was told by someone who had access to the report that it "exonerated" him.

39. When finally interviewed regarding his November 2019 complaint concerning the behavior of Ms. Jessie, the investigator asked Mr. Mulgrew, "why are they so consumed with you?"

40. The June 16, 2020 summary of the Woodbridge investigation that was provided to Mr. Mulgrew indicated that the individuals who witnessed Ms. Jessie's tirade confirmed to the investigator that Ms. Jessie acted in an inappropriate, unprofessional and bullying manner. They stressed the power differential between Ms. Jessie and Mr. Mulgrew with Ms. Jessie, as a School Board member, able to freely lodge her accusations while Mr. Mulgrew was restrained by his position to neither respond nor rebut her remarks.

41. Despite the observations of those who witnessed the behavior of Ms. Jessie and their determination that those actions rose to the level of bullying, the investigation concluded that Ms. Jessie's behavior did not rise to the level of bullying under the Code of Virginia. Her behavior was determined to be unprofessional and in violation of various sections of the School Board's Code of Conduct and Code of Ethics. It is unclear if Ms. Jessie suffered any negative actions as a result of her inappropriate behavior. No apology was given to Mr. Mulgrew and the Board, against school policy, inappropriately reimbursed Ms. Jessie for her legal fees, despite her behavior driving the investigation and despite findings of inappropriate behavior.

42. During later conversations with the then Superintendent, Mr. Mulgrew learned that during the Fall of 2019, the Board Chair petitioned the Superintendent to fire Mr. Mulgrew based on Mr. Mulgrew's alleged influence with the Woodbridge athletic situation. The Superintendent sought the assistance of the School Board attorney, Ms. McGowan, to advise Dr. Lateef that he was not allowed to have such conversations demanding a staff member be fired. The Board Chair was advocating for Mr. Mulgrew's termination without due process, which would be in violation of the terms of his employment.

43. While Mr. Mulgrew was not provided with a copy of the actual Woodbridge Report, he did learn that an individual that he had identified in his complaint had not been interviewed. Specifically, the Board Member who advised Mr. Mulgrew in the Spring of 2019 that the Board Chair was lobbying for his ouster, was not interviewed by Mr. Porter, the outside counsel retained to conduct the investigation. Mr. Mulgrew was told by the same Board member that, after being questioned about his phone call to that Board member, Dr. Lateef called that Board member and went "ballistic" over the fact that the Board member had shared the April phone call with Mr. Mulgrew. Without having access to the full Woodbridge report, Mr. Mulgrew does not know if Dr. Lateef admitted to the investigator that he had, in fact, made that call to a Board member, which would be highly inappropriate, or if he lied and denied making that call. There is no way for Mr. Mulgrew to have known the Board member was not interviewed unless told. Mr. Mulgrew did not reveal to the Board member that he included his conversation about the April phone call in his complaint.

44. In March of 2021, at the request of Human Resources, PWCS Risk Management initiated an investigation after an Assistant Principal received a series of parental complaints regarding a

teacher's failure to grade and post student assignments. This investigation would ultimately be referred to as the "Forest Park Investigation".

45. In the Spring of 2021, Mr. Mulgrew received a call from the Associate Superintendent for Human Resources, Dr. Donna Eagle. Dr. Eagle chided Mr. Mulgrew for not sharing that an employee, Cynthia Treichler at the Central Office wished to return to working in High Schools with the Associate who ultimately supervised her. Mr. Mulgrew advised Dr. Eagle that he had instructed the employee to reach out to her supervisor directly. Mr. Mulgrew was able to provide email documentation wherein Ms. Treichler advised she had, in fact, reached out to her immediate supervisor to discuss as directed by Mr. Mulgrew.

46.  Later that Spring, Mr. Mulgrew again received a call from Dr. Eagle who accused Mr. Mulgrew of another impropriety. Dr. Eagle alleged that "Word on the street is that you directed your principals to falsify payroll sheets." She refused to tell Mr. Mulgrew who had made that report. In response to this accusation, Mr. Mulgrew again provided information to HR, Donna Eagle, which exonerated his actions.

47. On June 14, 2021, Sean Robinson, Esq., on behalf of Coach Gary Wortham, directed a letter to Mary McGowen,  Division Counsel of PWCS accusing Mr. Mulgrew of various criminal activities. Cozy Bailey, the Prince William County NAACP President was copied on the letter. Mr. Baily has no relationship to the PWCS system but is associated with Lillie Jessie. There is a process for complaints firmly established in Prince William County and the employee, Mr. Wortham, did not follow those procedures when he included unassociated third parties in the distribution of his complaint.

48. Specifically, the June 14, 2021 letter accused Mr. Mulgrew of "tortiously interfering" with Mr. Wortham's attempts to secure a football coaching position at C.D. Hylton High School and "Blackballing" him from employment.

49. The letter concluded by stating that this "letter serves as a pre-litigation courtesy to resolve these matters outside of a court of law. Please advice [sic] Mr. Mulgrew that if this illegal interfering continues, that further legal actions will be taken to stop and correct Mr. Mulgrew intentional [sic] tortious interference."

50. After a preliminary investigation, Mary McGowen responded to Mr. Robinson's June 14, 2021 letter advising that her initial inquiry had found no evidence that Mr. Wortham had applied for the referenced coaching position at C.D. Hylton High School, which was still posted as an open, unfilled position. She further advised that no interviews had yet been scheduled and no recommendations for hiring had been submitted to the Department of Human Resources. Further, no one from Hylton had the authority, either at the time of her response or on May 17, 2021, to offer that position to any applicant.

51. Mr. Mulgrew was never aware of Mr. Wortham's applying for the position and did not get involved in hiring decisions for assistant coaching positions at high schools. He only approved or disapproved candidates once the name was entered into the HR system. Mr. Wortham's name was never entered into the system.

52. Despite Ms. McGowan request to Mr. Robinson provide for any and all information/documentation that provided support for these allegations, neither Mr. Robinson nor Mr. Wortham had the courtesy to even respond to the inquiry.

53. Mr. Mulgrew was made aware of this letter by Ms. McGowan, who showed him both the letter as well as the forwarding email and informed him that the letter was sent to Cozy Bailey in

addition to her. She also stated that this letter was defamatory. Mr. Mulgrew retained counsel, Stephen A. Bamberger, to engage with the school about these defamatory accusations.

54. On August 11, 2021, counsel for Mr. Mulgrew contacted Ms. McGowan and advised that should the issues raised in that letter proceed any further, he would require access to materials not currently available to Mr. Mulgrew to defend himself. The specific documents included, but were not limited to, various investigative reports prepared related to Mr. Mulgrew's complaints related to Ms. Jessie (i.e. the Woodbridge Report) Ms. McGowan, on August 12, then called Mr. Bamberger and advised that the District would make sure the Woodbridge report remained confidential.

55. Despite the fact that absolutely no basis for the allegations raised by Mr. Wortham were provided to Ms. McGowan, Mr. Wortham was not subjected to any discipline for filing a false criminal complaint against a PWCS employee nor was he required to formally withdraw his unfounded allegations nor apologize to Mr. Mulgrew. Further, communications related to Mr. Wortham's defamatory letter remain in Mr. Mulgrew's personnel file to this day in contravention of PWCS policy.

56. On August 13, 2021, Mr. Mulgrew was requested to meet with Latanya D. McDade, Superintendent of Schools and Human Resources. He was not told of the purpose of that meeting. Donna Eagle, Associate Superintendent for Human Resources, was also present at this meeting.

57. During the meeting, Dr. McDade advised Mr. Mulgrew of the ongoing Forest Park investigation and assured Mr. Mulgrew that he was not the target of the investigation.

58. Mr. Mulgrew was required to sign an August 13, 2021 letter acknowledging that he received and read the letter. The signature was not an acknowledgment that he agreed with the contents of the letter or that he believed the contents of that letter were accurate.

59. Dr. McDade assured Mr. Mulgrew that this administrative leave was done for his "protection" and the Superintendent said, "I have had to do this kind of thing before." Contrary to the Regulation regarding complaints at the time, Mr. Mulgrew was not afforded the opportunity to speak or address any of their concerns..

60. As a result of the actions of McDade, Mr. Mulgrew again consulted with his counsel. On September 2, 2021, Mr. Bamberger again contacted Mary McGowan on behalf of Mr. Mulgrew and advised that he would require access to all documentation that resulted in the Superintendent's decision to suspend Mr. Mulgrew. At that point, Mr. Mulgrew was unaware of the existence of an August 12, 2021 letter authored by Donna Eagle that relayed preliminary allegations related to Mr. Mulgrew and was later denied access to that letter.

61. When Mr. Mulgrew was finally interviewed in or around November of 2021, he was, for the first time, informed by the investigator that he, Mr. Mulgrew, was in fact, the subject of the investigation. Because he was intentionally misled as to the true nature of the investigation, Mr. Mulgrew was not accompanied by legal counsel for the interview as any subject of an investigation would have the right to do. He was blindsided by the actions of the administration and the investigator.

62. On July 02, 2021, Risk Management and Security Services of PWCS received an anonymous complaint related to the inability to schedule the athletic field at Freedom High School. Apparently, the issue centered around Freedom High School football coach, Darryl D. Overton's use of the field for his private business to the exclusion of any other users.

14

63. An investigation was conducted that determined that Mr. Overton, despite multiple directives, including a written one from Mr. Mulgrew, over a number of years that he was not to utilize the fields for his personal business, continued with this practice. In addition, Mr. Overton avoided paying the appropriate fees for the use of the fields in direct contravention of the rules promulgated by the PWCS.

64. The investigation discovered at least two 2019 events that were represented as fundraisers for Freedom Football but were in fact fundraisers for Mr. Overton's' private business, PME.

65. Despite the findings of the August 2021 investigative report, which was known to the Freedom administration, Mr. Overton continued to utilize the Freedom High School fields throughout August, September and October without payment of appropriate fees. Ultimately, instead of appropriate punishment for his actions, Mr. Overton was given the opportunity to "retroactively" pay back a portion of the funds for field usage to the Division.

66. Despite the findings of the Freedom/Overton investigative report that found three individuals had violated various PWCS policies and regulations and also advised that a police investigation into the failure to pay for use of the fields would be one appropriate action against those involved, the Division did not take any significant action against these individuals. None of the persons responsible were placed on administrative leave and were permitted to remain in their jobs with the school system or remained working with PWCS after retirement through an agreement with the PWCS. These actions over the time frame involved could constitute a felony in Virginia but PWCS did not respond accordingly in their response to these findings.

67. All of the individuals involved with the Freedom football situation are African American or White and were not held to the standards required by PWCS policy or by the law.

68. The Division covered up the actions of these employees, allowing all to remain employed with PWCS or continue to work after retiring from the system.

69. Mr. Mulgrew remained on paid administrative leave into January of 2022. It became increasingly clear to Mr. Mulgrew that he would never be permitted to return to active employment and understood the actions of PWCS to be a concerted effort to force Mr. Mulgrew from his position with PWCS.

70. In the event Mr. Mulgrew were terminated by PWCS, he would face the possible loss of certain retirement benefits.

71. Believing that there was no other option and in an effort to best protect his interests, Mr. Mulgrew engaged in settlement negotiations with PWCS in February 2022 for the terms of his retirement.

72. One of the retirement privileges available to PWCS retirees is participation in the Retirement Opportunity Program ("ROP") which provides the opportunity for additional income for retirees. (PWCS Regulation 555-5). If Mr. Mulgrew were terminated, he would have no opportunity to take part in this program.

73. While PWCS policy permits the Division to deny ROP for a bad evaluation, in most cases, that was not the result. For instance, the Freedom principal who was one of the targets of the Freedom/Overton investigation, while not granted ROP, was permitted to work in an after-retirement capacity similar to ROP.

74. Unfortunately, negotiations for Mr. Mulgrew's retirement broke down when PWCS refused Mr. Mulgrew access to the ROP program because of the Forest Park and Freedom/Overton" investigations. Mr. Mulgrew was  told by Ms. McGowan that "now, we do not need to tell people when we are investigating them"

75. Mr. Mulgrew understood this reason to be a threat inasmuch as the Freedom/Overton investigation had been concluded in August of 2021 with a finding against three individuals. Mr. Overton was found to have violated multiple PWCS policies and regulations including Regulation 930-2 Community Relations, Community Use of High School Athletic Facilities, Paragraph XII by fraudulently misrepresenting that the athletic fields were reserved for high school activities when in reality, they were reserved, without required payment, for his personal business use. Two other individuals were found to have violated policies as well. There is nothing in the August 2021 Freedom/Overton report that lays any responsibility or blame at the feet of Mr. Mulgrew.

76. Despite what appeared to be the closing of the Overton investigation in 2021, in February 2022, Mr. Mulgrew was informed by Ms. McGowan that a new investigation into his supervision of Freedom (the Overton investigation) was to occur. It was clear that the intent was to deflect the blame for the behavior of the African American employees onto Mr. Mulgrew and further destroy any ability to resolve his issues with PWCS and retire with his privileges intact.

77.  As stated, Mr. Mulgrew was offered a settlement agreement that would have stripped him of his right to participate in the PWCS Retirement Opportunity Program (ROP) and would have prevented him from bringing any legal action against PWCS or anyone associated with PWCS.

78. Knowing these facts and learning of another pretextual investigation into his supervision of Freedom, Mr. Mulgrew retired in February 2022.

### COUNT I
### RETALIATION IN VIOLATION OF EEOC

79. Plaintiff incorporates the allegations of Paragraph 1 – 78 as if fully restated herein.

80. Plaintiff Mickey Mulgrew is of Puerto Rican descent.

81. Starting in 2005 and as documented in his November 2019 complaint to the PWCS, Mr. Mulgrew was subjected to discrimination based on his race that continued and culminated with his forced retirement in January of 2022.

82. Mr. Mulgrew was subjected to years of unwarranted attacks on his professionalism and employment because of animosity toward his race.

83. In November of 2019, Mr. Mulgrew filed a complaint related to the behavior of Ms. Lillie Jessie, a Board Member, which related to her animosity toward Mr. Mulgrew because of his Puerto Rican heritage and what she portrayed as his racism against Black individuals.

84. As a result of retaliation for filing a complaint in 2019, Mr. Mulgrew was subjected to defamatory allegations by a school coach, harassment by HR, attempts by School Board members to interfere with and/or terminate his contract and subjected to multiple investigations culminating in a long term suspension that led to what was essentially a forced retirement from the PWCS system.

85. Both at the time of the November 2019 complaint as well as subsequent to that time, PWCS understood that Mr. Mulgrew was the subject of discrimination based on his race and took no steps to reign in that behavior, starting with the findings of the Woodbridge investigation into Ms. Jessie available to PWCS in June of 2020.

86. Plaintiff is a member of a protected class who suffered adverse employment action despite no legitimate issues with his performance.

87. The Defendant's conduct as alleged above constituted discrimination based on race and ethnicity in violation of Title VII.  Defendant was subjected to retaliation for protected activity, unwarranted investigation and suspension, was misled about being the target of an investigation,

threatened with the opening of new and wholly unwarranted further investigations and left with no option but to retire in order to best protect his retirement benefits.

88. As a result of the hostile, offensive and discriminatory behavior by the Defendant, its agents and employees, and the failure of the Defendant to protect Plaintiff from such discrimination, Plaintiff suffered humiliation, emotional stress and loss of employment.

89. As a result of the discriminatory behavior of Defendant, Plaintiff has suffered loss of income and loss of earning potential.

90. Mr. Mulgrew has experienced emotional pain and suffering as a result of the discriminatory behavior of the Defendant which was engaged in knowingly and intentionally with the intended result of forcing him from his position with PWCS.

91. The Defendant, through its agents and/or employees failed to adequately supervise the conduct that led to the race and ethnicity discrimination suffered by Plaintiff. The Defendant failed to take all necessary and reasonable steps to eliminate discrimination based on race and ethnicity from the workplace and to prevent it from occurring in the future.

92. As further direct and proximate cause of Defendant's violation of Title VII as described above, Plaintiff has been compelled to repeatedly retain the services of counsel in an effort to protect his rights with respect to the Defendant's actions and has thereby incurred and will continue to incur legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff.

**COUNT II**
**BREACH OF EMPLOYMENT CONTRACT**

93. Plaintiff incorporates the allegations of Paragraph 1 – 92 as if fully restated herein.

94. Plaintiff and Defendant entered into a contract at the start of Mr. Mulgrew's employment with PWCS and that contract was renewed each year going forward with the term of the last contract July 1, 2021 through June 30, 2022. **(Att. B)**

95.  Under the terms of the contract, Paragraph 4, Mr. Mulgrew was expected to abide by, and conduct himself in comportment with, the various Policies, Procedures and Regulations of the PWCS Board. Conversely, the contract also afforded Mr. Mulgrew the same protections and benefits set forth in those Policies, Procedures and Regulations that were extended to all other employees of the PWCS Board.

96. Mr. Mulgrew's employment  contract provided for termination only under certain specific circumstances.

97. Through the last 15 or so years with PWCS, Mr. Mulgrew was subjected to harassment, uneven treatment and bullying as set forth in Paragraph 1 through 92 of this Amended Complaint.

98.  Although the standard PWCS contracts contained the same provision that all employees were required to abide by the policies, procedures and regulations of PWCS, those policies/procedures and regulations were not uniformly imposed or upheld with various employees who were found to have violated significant policies and regulations going without any punishment or penalty while Mr. Mulgrew neither received any relief as a result of his November 2019 complaint related to the inappropriate and policy breaking behavior of Ms. Jessie nor was treated the same as other employees, being subjected to a baseless investigations with findings not supported by facts.

99. Other  PWCS employees, to include but not be limited to those found to have violated policies in the Freedom/Overton report, were subject to the same policies and regulations as Mr.

Mulgrew and were found to have violated Division policies and procedures and committed felonious activities, contrary to management direction to cease the behavior.

100.  Instead of being forced from their jobs, these individuals were granted the ability to retroactively correct their intentional violations of policy and law, continue to maintain employment with PWCS and after retirement, were permitted to continue to work within the System for financial gain.

101.  In an effort to push Mr. Mulgrew out of employment with PWCS, employees and agents of Defendant subjected Mr. Mulgrew to years of inappropriate, harassing, bullying and discriminatory behavior resulting in multiple investigations purportedly into his behavior.

102.  On August 21, 2021, Mr. Mulgrew was advised that he was being placed on Administrative Leave with pay, for his own protection, pending an external investigation into his role related to a teacher accused of misconduct.

103.  Contrary to his contract and PWCS policies and regulations in effect at the time, Mr. Mulgrew was not afforded the opportunity to defend himself in these investigations and was in fact, specifically advised by Dr. Latanya McDade that he was not the subject of the investigation, causing him to present for interview without legal representation.

104.  The statements of Dr. McDade were untrue on their face as evidenced by the content of the August 12, 2021 Superintendent's Working Paper related to Mr. Mulgrew's alleged involvement in the internal investigation of the faculty member which was withheld from Mr. Mulgrew.

105.  Mr. Mulgrew was not afforded the opportunity to review the investigative report related to his 2019 complaint against Ms. Lillie Jessie, nor was he permitted the opportunity to review any portions of the investigative report related to the misconduct of the Forest Park High School

teacher that was, allegedly, the basis for his administrative leave and the efforts to push Mr. Mulgrew out of his job.

106.  Defendant used the 2021 investigation into "employee misconduct" related to a High School teacher as a pretense for pushing Mr. Mulgrew out of his employment with PWCS.

107.  Mr. Mulgrew did not violate the terms of his contract nor did he engage in any behavior that would have warranted his dismissal from PWCS per the terms of his contract and the Rules, Regulations and Policies of PWCS.

108.  The uneven and unfair application of relevant Policies, Procedures and Regulations specific to Mr. Mulgrew's experience as an employee of PWCS Board include, but are not limited to, the following:

    **a.  Policy 503 Code of Conduct:**  All PWCS employees are held to a high standard of personal and professional conduct. Neither Ms. Jessie nor the three individuals involved in the Freedom/Overton investigation appear to have been held to the standards that Mr. Mulgrew was required to meet and exceed.

    **b.  Policy 506 Communications with Employees**:  PWCS Board will strive to maintain formal and informal channels of communication with all employees. The Board shall strive to develop the best possible working relationship with employees. As set forth in the Fact section of this Amended Complaint, various Board members, including but not limited to Lillie Jessie, repeatedly violated this policy in their attempts to harass Mr. Mulgrew, accuse him of racist behavior and to force him from his employment

    **c. Regulation 506-3 Employee Rights, I.** Employees shall not be retaliated against for exercising any rights. Despite this regulation, subsequent to the filing of the November 2019 complaint concerning the behavior of Board member Lillie Jessie, not only did the

aggrieved behavior not stop, it was increased in severity, frequency and the number of individuals involved until it culminated in the ultimate forced resignation of Mr. Mulgrew.

**d. Regulation 506.3 Employee Rights**: **V**: Upon request, the employee has the right to be informed of the proposed nature of any conference to be held between the employee and supervisor. When such a conference concerns any formal disciplinary matter, including a letter of reprimand, recommendation for dismissal or suspension or when another supervisor is present at such a conference, the employee shall have the right to have present during the conference a silent witness of the employee's choice other than an attorney. As set forth above, when Mr. Mulgrew was requested to meet with Dr. McDade in August of 2021, he was not provided with the benefit of the protocol set forth in this Regulation. He was not informed of the purpose of that meeting and despite the presence of another supervisor (Ms. Eagle) he was not afforded the ability to have a silent witness present and was otherwise not provided with the protections required under this regulation.

**e. Regulation 561-5 Complaints Against School Officials and Employees other Than Discrimination and/or Grievances** covers workplace bullying and abusive work environments. Despite Mr. Mulgrew's express complaint related to the behavior of Ms. Jessie, instead of taking action against the aggressor to eliminate the inappropriate behavior, the PWCS Board failed to discipline Ms. Jessie and thereafter participated in the further and ongoing harassment and bullying of Mr. Mulgrew until he was forced to retire in an effort to preserve certain retirement benefits.

**f. Regulation 572-3 Suspension of Employees: Part I Prior Notice of Suspension:** An employee shall be provided with written notice of the proposed suspension and the reasons for same and shall also be provided with a copy of this regulation along with an explanation of the suspension process. While Mr. Mulgrew was provided with a copy of the August 13, 2021 letter from Dr. McDade, the remaining formalities required under this regulation were not followed, providing further credence to Mr. Mulgrew's position that Dr. McDade told him to disregard the contents of that letter and to be assured that his being placed on leave was solely for his protection.

**g. Regulation 505-1 Employee Central Office Human Resources File (Personnel File): Subpart IV:** This subpart specifically excludes from the employee personnel file "F. Complaints that do not meet the definition of a Grievance as defined in Regulation 508.01-1 and 508.02-1" and "O. Information determined to be unfounded after a reasonable administrative review if such information alleges civil or criminal offenses." Despite this, documentation related to the wholly unfounded June 14, 2021 letter on behalf of Mr. Wortham alleging criminal acts against Mr. Mulgrew is still maintained within the personnel file instead of within "a separate secured file" as required under Subpart IV of the Regulation.

109.  As further explanation,  PWCS Regulation 561-5 expressly prohibits workplace bullying and abusive work environments. Under that Regulation, Bullying is defined as "any aggressive or unwanted behavior by a PWCS officer or employee that:

a.  is intended to harm, intimidate or humiliate the victim;

b. involves a real or perceived power imbalance between the aggressor or aggressors and the victim and

c. is repeated over time or causes severe emotional trauma."

110. There is no question that the behavior of the school board dating from 2005 and continuing up to the very day of Mr. Mulgrew's forced retirement in February of 2022 constituted unwanted and harassing behavior toward Mr. Mulgrew. The School Board was in a power position in contrast to Mr. Mulgrew as they had the ability to terminate his employment. The actions were repeated over time and culminated in the loss of employment for Mr. Mulgrew.

111. As a result of the breach of contract on the part of Defendant, Mr. Mulgrew has suffered financial loss in the form of lost wages, lost earning potential, lost income based on his prohibition from participating in the Retirement Opportunity Program and ongoing legal expenses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against the Defendant and prays that this Court grant the following relief.

1) With regard to either Count I or Count II: Damages in an amount to be proven at trial but in excess of Six Hundred Fifty Thousand Dollars ($650,000.00);

2) With regard to Count I:

a) Pain and suffering;

b) Award the costs of this action and reasonable attorneys' fees and expenses;

c) Punitive damages to punish the Defendant for its willful, wanton, oppressive, malicious and/or grossly negligent conduct;

3) With regard to either Count I or Count II: Award pre-judgment and post-judgment interest; and

4) Grant such other and further relief as the Court should deem just.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues for which a trial by jury may be had.

**DATED:**  May 5, 2023                    Respectfully submitted,
                                           Michael Mulgrew
                                           By Counsel


                                                    /s/Milton C. Johns
                                           _____
                                           Milton C. Johns, VSB No. 42305
                                           Jill F. Helwig, VSB No. 83202
                                           Executive Law Partners, PLLC
                                           11130 Fairfax Blvd, Suite 303
                                           Fairfax, VA 22020
                                           T: (571) 500-1010
                                           F: (571) 408-8102
                                           mjohns@xlppllc.com
                                           jhelwig@xlppllc.com
                                           *Counsel for Plaintiff*